CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
September 26, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | |
|---|---|
| **WALTER RANDOLPH NAPIER, JR.,** ) | |
| Plaintiff, ) | **Case No. 7:23-cv-00098** |
| ) | |
| **v.** ) | |
| ) | **By: Michael F. Urbanski** |
| **PAUL C. OHAI, et al.,** ) | **Senior United States District Judge** |
| Defendants. ) | |

## <u>MEMORANDUM OPINION</u>

Walter Randolph Napier, Jr., a state inmate proceeding <u>pro se</u>, filed this civil action under 42 U.S.C. § 1983 against the Commonwealth of Virginia, the Virginia Department of Corrections (VDOC), and 28 individuals employed by or associated with the VDOC. Napier claims that the defendants failed to provide adequate medical treatment while he was incarcerated at Buckingham Correctional Center (BKCC), in violation of the Eighth Amendment and Virginia law.

Eighteen individual defendants represented by the Office of the Attorney General of Virginia (collectively, the VDOC defendants) and four defendants represented by outside counsel (collectively, the medical defendants) have moved to dismiss Napier's second amended complaint under Federal Rule of Civil Procedure 12(b)(6). Napier has filed a response in opposition to the motion and a motion requesting that the court effect service of process on eight defendants. For the reasons set forth below, the VDOC defendants' motion to dismiss, ECF No. 94, is **GRANTED**; the medical defendants' motion to dismiss, ECF No. 96, is **GRANTED IN PART AND DENIED IN PART**; and Napier's motion for service of process, ECF No. 98, is **GRANTED IN PART AND DENIED IN PART**.

# I.    Background

Napier filed the operative second amended complaint on October 24, 2024. ECF No. 79. The pleading is over 100 pages long and is accompanied by more than 60 pages of exhibits. It also references exhibits submitted with the original complaint, which span nearly 400 pages. See ECF Nos. 1-1–1-6.[1]  In addition to the Commonwealth of Virginia and the VDOC, Napier names the following individuals as defendants: Dr. Paul C. Ohai; Registered Nurses (RNs) Daniel Bland, Alana Starkey, Marsha Stanford, and Amy Worrell; Nurse Practitioners (NPs) Leah Lange, K. Yisrael, Barbara Frost, and Amelia Allen; Licensed Practical Nurse (LPN) Amy Jamerson; VDOC Chief of Corrections Operations A. David Robinson; former VDOC Director Harold Clarke; VDOC Chief Health Services Administrator Dr. Mark Amonette; VDOC Chief Health Services Administrator Fred Schilling; VDOC Health Services Administrator Steve Herrick; VDOC Health Services Directors Adrian Tucker, Marcus Elam, and Jeffrey Dillman; VDOC Administrator Rose Durbin; BKCC Wardens Larry Edmonds and John Woodson; BKCC Assistant Wardens/Grievance Coordinators Jeffrey Snoddy and Eva Moore; BKCC Grievance Coordinator Stacy Meinhard; VDOC Central Region Grievance Operations Manager Teresa Harvey; VDOC Central Region Grievance Coordinators S. Moe-Willis and Deborah Hudson; and BKCC Operations Manager/Grievance Administrator Christine Bryant. 2d Am. Compl., ECF No. 79, at 1–7. The defendants are sued in their individual and official capacities.

Napier asserts Eighth Amendment claims related to the following medical issues: diabetic neuropathy; Bell's palsy; ear, nose, and throat (ENT) symptoms; hypertension; diabetes;

---

[1] When referencing the exhibits submitted by Napier, the court will use the docket and page numbers assigned by the court's CM/ECF system.

and a prior history of skin cancer. He also asserts claims under state law for "medical negligence, violations of statutory law, and the intentional infliction of emotional distress." 2d Am. Compl. ¶ 9. He seeks compensatory damages, punitive damages, and unspecified declaratory and injunctive relief.

The VDOC defendants and the medical defendants have moved to dismiss the second amended complaint under Rule 12(b)(6). The VDOC defendants include VDOC administrators Robinson, Clarke, Amonette, Schilling, Herrick, Tucker, Elam, Dillman, Harvey, Moe-Willis, and Hudson; BKCC officials Edmonds, Woodson, Snoddy, Moore, Meinhard, and Bryant; and RN Worrell, a provider scheduler employed by the VDOC. The four medical defendants currently represented by outside counsel are Dr. Ohai and RNs Bland, Starkey, and Stanford.[2]

The court has reviewed all of Napier's factual allegations and exhibits. The court will discuss the allegations and exhibits relevant to each claim and defendant in the discussion section below.

## II.    Standard of Review

Rule 12(b)(6) permits defendants to seek dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Similarly, under the Prison Litigation Reform Act, the court may dismiss a complaint or any portion of a complaint filed against a governmental entity or officer that "fails to state a claim upon which relief may be granted" or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

---

[2] It is unclear from the record whether the four medical defendants were employed by the VDOC during the time period in question or worked for one of the private corporations that contracts with the VDOC to provide medical services to inmates.

To survive dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While "detailed factual allegations" are not required, a complaint must contain more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." Id. (internal quotation marks and brackets omitted).

When evaluating whether a complaint states a claim upon which relief can be granted, "the court must construe all factual allegations in the light most favorable to the plaintiff." Wilcox v. Brown, 877 F.3d 161, 166-67 (4th Cir. 2017). "Additionally, when a plaintiff raises a civil rights issue and files a complaint pro se, the court must construe pleading requirements liberally." Id. "But 'liberal construction does not mean overlooking the pleading requirements under the Federal Rules of Civil Procedure.'" Seabrook v. Driscoll, 148 F.4th 264, 279 (4th Cir. 2025) (quoting Bing v. Brivo Sys., LLC, 959 F.3d 605, 618 (4th Cir. 2020)). A complaint filed without the assistance of counsel "still must contain enough facts to state a claim for relief that is plausible on its face." Thomas v. Salvation Army S. Terr., 841 F.3d 632, 637 (4th Cir. 2016) (internal quotation marks omitted). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint must be dismissed. Iqbal, 556 U.S. at 679.

In determining whether a complaint states a plausible claim for relief, the court may "consider documents that are explicitly incorporated into the complaint by reference" or

"attached to the complaint as exhibits." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). The court also "may properly take judicial notice of matters of public record." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

### III.    Discussion

### A.    Claims against the Commonwealth of Virginia, the VDOC, and the VDOC Defendants in Their Official Capacities

As an initial matter, any claim under 42 U.S.C. § 1983 against the Commonwealth of Virginia or the VDOC must be dismissed because these defendants are not "persons" subject to liability under the statute. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). The same is true for any claims for damages against the defendants in their official capacities. Id.; see also Fauconier v. Clarke, 966 F.3d 265, 279–80 (4th Cir. 2020) ("[W]hereas 42 U.S.C.    § 1983 permits suit against 'every person' who deprives an individual of his or her rights under color of state law, neither States nor state officials acting in their official capacities constitute 'persons' within the meaning of the statute when sued for monetary relief.").

Additionally, Napier's claims under § 1983 and state law against the Commonwealth, the VDOC, and the VDOC defendants in their official capacities implicate the Eleventh Amendment. "The Eleventh Amendment and the broader principles of federalism it reflects generally prevent private parties from suing a State [in federal court] without its consent." King v. Youngkin, 122 F.4th 539, 543 (4th Cir. 2024). The immunity afforded by the Eleventh Amendment "extends to arms of the State, including state agencies and state officers acting in their official capacity." Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996) (internal quotation marks and citations omitted). Unless a State's Eleventh Amendment immunity has been waived or abrogated, any claim against a State or a state agency is "barred regardless of the relief

sought." Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993). This includes pendent claims under state law. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 120 (1984); see also Raygor v. Regents of the Univ. of Minn., 534 U.S. 533, 542 (2002) (holding that a district court's ability to exercise supplemental jurisdiction over state law claims under 28 U.S.C. § 1367(a) "does not extend to claims against nonconsenting defendants"). Likewise, "[t]he Eleventh Amendment bars suit against state officials in their official capacity for damages under 42 U.S.C. § 1983," Lawson v. Gault, 828 F.3d 239, 278 (4th Cir. 2016), as well as any claim under state law asserted against the VDOC defendants in their official capacity, regardless of the relief sought. See Experimental Holdings, Inc. v. Farris, 503 F.3d 514, 520-21 (6th Cir. 2007) ("The Supreme Court has squarely held that pendent state law claims against state officials in their official capacity are barred by the Eleventh Amendment.") (citing Pennhurst, 465 U.S. at 117–21).

Napier does not plausibly allege that the immunity afforded by the Eleventh Amendment has been abrogated or waived by the Commonwealth. "While Congress may abrogate a State's Eleventh Amendment immunity by express statutory language, it has long been settled that 42 U.S.C. § 1983 . . . does not effect such an abrogation." In re Sec'y of Dep't of Crime Control & Pub. Safety, 7 F.3d 1140, 149 (4th Cir. 1993). Likewise, the Virginia Tort Claims Act only "waive[s] sovereign immunity for tort claims filed in state courts" and "does not waive the state's eleventh amendment immunity" in federal court. McConnell v. Adams, 829 F.2d 1319, 1329 (4th Cir. 1987); see also Sossamon v. Texas, 563 U.S. 277, 285 2011) (explaining that a waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor the sovereign" and, thus, that a "State's consent to suit in its own courts is not

6

a waiver of its immunity from suit in federal court"). For these reasons, the court concludes that the Eleventh Amendment bars Napier's claims under § 1983 and state law against the Commonwealth of Virginia and the VDOC, his claims for damages under § 1983 against the VDOC defendants in their official capacities, and his claims under state law against the VDOC defendants in their official capacities.

Although the Eleventh Amendment "does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law" by a state official Green v. Mansour, 474 U.S. 64, 68 (1985) (citing Ex parte Young, 209 U.S. 123, 155–56 (1908)), Napier has not satisfied the requirements for this exception. "To successfully bring a claim against a state official in their official capacity for a violation of the Constitution, plaintiffs must 'allege an ongoing violation of federal law and seek relief properly characterized as prospective.'" Talley v. Folwell, 133 F.4th 289, 298 (4th Cir. 2025) (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002)). For a violation to be considered "ongoing" for purposes of this exception to Eleventh Amendment immunity, "the officials sued must be 'in violation of federal law at the precise moment when the case was filed.'" Id. (quoting Republic of Paraguay v. Allen, 134 F.3d 622, 628 (4th Cir. 1998)).

For the reasons discussed below, Napier has not plausibly alleged that any of the VDOC defendants violated his Eighth Amendment right to adequate medical treatment prior to filing this action. Nor has he shown that any of the VDOC defendants was violating federal law "at the precise moment" that the action was filed. Id.; see also id. ("Here, the defendants were not in violation of federal law by the time Talley filed her complaint, if they ever were."). Thus, even

if the operative complaint can be construed as seeking prospective equitable relief, Napier's claims against the VDOC defendants in their official capacities must be dismissed.

**B.     Eighth Amendment Claims under 42 U.S.C. § 1983**

Napier seeks relief under § 1983 for alleged violations of his Eighth Amendment right to adequate medical treatment. "Liability under § 1983 must be analyzed individually for each defendant." Jones v. Solomon, 90 F.4th 198, 207 (4th Cir. 2024). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676.

"The Eighth Amendment, which is applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017) (quoting U.S. Const. amend. VIII). "Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018). An Eighth Amendment violation occurs when a prison official or healthcare provider "demonstrates 'deliberate indifference' to an inmate's serious medical needs." Id.

An Eighth Amendment claim of deliberate indifference has two components. Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). The plaintiff must show that he had serious medical needs (the objective component) and that a defendant acted with deliberate indifference to those needs (the subjective component). Hixson v. Moran, 1 F.4th 297, 302 (4th Cir. 2021). A medical need is sufficiently serious for purposes of the objective component "when it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person

8

would easily recognize the necessity for a doctor's attention." Gordon v. Schilling, 937 F.3d 348, 356 (4th Cir. 2019) (internal quotation marks omitted).

The subjective component of deliberate indifference "requires showing that the defendant 'had actual subjective knowledge of both the plaintiff's serious medical condition and the excessive risk posed by the official's action or inaction.'" Phoenix v. Amonette, 95 F.4th 852, 859 (4th Cir. 2024) (brackets omitted) (quoting Jackson, 775 F.3d at 178). To satisfy this element, Napier must show that a defendant "knew of and disregarded an excessive risk to [his] health or safety." Id. (internal quotation marks omitted). This is an "exacting standard." Jackson, 775 F.3d at 178. "Disagreements between an inmate and a physician over the inmate's proper medical care do not cut it, and evidence that might show medical malpractice is not necessarily sufficient." Phoenix, 95 F.4th at 859 (internal quotation marks and citations omitted); see also Hixson, 1 F.4th at 303 ("Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'") (quoting Farmer v. Brennan, 511 U.S. 925, 844 (1994)). Instead, "[o]nce prison officials are aware of a serious medical need, they only need to 'respond[] reasonably to the risk.'" Id. at 302 (quoting Farmer, 511 U.S. at 844). Although "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." De'Lonta v. Johnson, 708 F.3d 520, 526 (4th Cir. 2013) (footnote omitted). "[G]overnment officials who ignore indications that a prisoner's . . . initial medical treatment was inadequate can be liable for deliberate indifference to medical needs." Stevens v. Holler, 68 F.4th 921, 932 (4th Cir. 2023) (internal quotation marks omitted).

It is against this backdrop that the court proceeds to evaluate the claims against the individual VDOC and medical defendants.

### 1.    Claim 1: Inadequate Treatment for Diabetic Neuropathy

In his first claim, Napier seeks to hold various defendants liable for failing to adequately treat his diabetic neuropathy. Napier alleges that this condition, when not properly treated, causes "severe, unyielding pain in his feet, legs, and hip; hot flashes; restless leg syndrome; [and an] inability to rest, relax nor sleep for any duration of time." 2d Am. Compl. ¶ 11.

Prior to June 2019, Napier was prescribed gabapentin for diabetic nerve pain. Id. Gabapentin, also known by the brand name Neurontin, is an anticonvulsant medication that has been approved by the Food and Drug Administration (FDA) for the treatment of epileptic seizures and postherpetic neuralgia. See Apotex, Inc. v. FDA, 393 F.3d 210, 211 (D.C. Cir. 2004); Smith v. Marthakis, No. 3:23-cv-00216, 2025 WL 2613448, at *2 (N.D. Ind. Sept. 9, 2025). It is also administered "off-label" for "addressing pain from diabetic neuropathy." Thomas v. Booth, 3:21-cv-50200, 2024 WL 4027919, at *3 n.6 (N.D. Ill. Sept. 3, 2024) (citation omitted).[3]

Effective July 1, 2019, gabapentin was classified as a Schedule V controlled substance in Virginia. See Va. Code Ann. § 54.1-3454. "A controlled substance is generally understood to be any of a category of behavior-altering or addictive drugs, . . . whose possession and use are

---

[3]    See also Gabapentin, U.S. National Library of Medicine: Medline Plus, available at https://medlineplus.gov/druginfo/meds/a694007.html (last accessed Sept. 24, 2025) ("Gabapentin is also sometimes used to relieve the pain of diabetic neuropathy (numbness or tingling due to nerve damage in people who have diabetes).").

restricted by law." <u>United States v. Ruth</u>, 966 F.3d 642, 654 (7th Cir. 2020) (internal quotation marks omitted).

In June 2019, according to Napier, VDOC defendants Clarke, Robinson, Amonette, Herrick, Tucker, and Dillman implemented a new policy that restricted correctional medical providers from prescribing gabapentin for pain. 2d Am. Compl. ¶¶ 12, 41–42. Napier asserts that the policy change "was promulgated without concern for inmate health" and expresses the belief that it was for "cost savings." <u>Id.</u> ¶ 41.

After Napier's prescription for gabapentin was discontinued, "he was prescribed a litany of substitutes," including "debilitating psychotropics." <u>Id.</u> ¶ 14 n.5. However, none of the substitutes controlled Napier's neuropathic pain. <u>Id.</u> He alleges that gabapentin is the "only medication" that provides him effective pain relief. <u>Id.</u> ¶ 23.

Napier alleges that Dr. Ohai, the head physician at BKCC, issued a memorandum in November 2019 indicating that inmates who were taking gabapentin "would have their medical files individually reviewed for 'medical need.'" <u>Id.</u> ¶ 22. Napier alleges that, contrary to the memorandum, Dr. Ohai "did not individually review his file or assess his specific individual medial need." <u>Id.</u> Instead, Dr. Ohai "forbade" the BKCC medical staff from administering gabapentin to Napier. <u>Id.</u> When Napier had a "face-to-face medical appointment" with Dr. Ohai on September 1, 2020, Napier specifically informed Dr. Ohai of his "unmitigated foot and leg pain, and the non-effective medications providers had prescribed." <u>Id.</u> ¶ 24. "Napier explained the excruciating pain and, in particular, his inability to sleep at night due to the pain and leg-twitching." <u>Id.</u> He also emphasized that he had successfully taken gabapentin "for years" prior to his prescription being discontinued. <u>Id.</u> Nonetheless, Dr. Ohai refused to prescribe the

medication and claimed that "'Richmond' no longer 'allowed' gabapentin treatment." Id. ¶¶ 24–25. However, other members of the medical staff informed Napier that "it was Ohai who refused to allow gabapentin prescriptions even though clinically appropriate." Id. ¶ 22 n.10.

From mid-2019 through 2022, Napier submitted written complaints and regular grievances complaining of ongoing nerve pain. Id. ¶ 14. In one of the complaints addressed to defendant Bland, an RN who served as the "Health Authority" at BKCC, Napier asserted that Celebrex[4] was not effectively alleviating the "nerve pain and burning." Id. Bland responded that Celebrex and Cymbalta[5] had been ordered for pain and suggested that Napier submit a sick-call request. Id. ¶ 15. Napier alleges that he complained to Bland on multiple other occasions about the fact that the "BKCC medical staff was not providing a 'working' treatment plan nor medications," but that Bland "offered no help." Id. ¶¶ 16–17. In one of the complaints, Napier indicated that he had been "seen" by Dr. Ohai, NP Yisrael, and NP Lange and that none of them would prescribe a medication that actually "decrease[d] his neuropathy and pain." Id. ¶ 18.

At various times in 2020, 2021, and 2022, Napier spoke to NP Frost, RN Starkey, and RN Worrell, when he appeared for medical appointments at BKCC. Id. ¶ 28. During their conversations, Napier "verbalized . . . how he was in constant pain due to his diabetic nerve

---

[4] Celebrex is the brand name for celecoxib, a nonsteroidal anti-inflammatory drug (NSAID) used to relieve pain, tenderness, and swelling. See Celecoxib, U.S. National Library of Medicine: Medline Plus, available at https://medlineplus.gov/druginfo/meds/a699022.html (last accessed Sept. 24, 2025)

[5] Cymbalta is the brand name for duloxetine, an antidepressant medication that is "also used to treat pain and tingling caused by diabetic neuropathy." Duloxetine, U.S. National Library of Medicine: Medline Plus, available at https://medlineplus.gov/druginfo/meds/a604030.html (last accessed Sept. 24, 2025).

pain." Id. Nonetheless, these defendants did not provide any additional medical treatment. Id. ¶ 29.

Napier alleges that he submitted various grievances complaining of ongoing nerve pain, which were reviewed by Grievance Coordinator Meinhard, Assistant Warden Snoddy, Warden Woodson, Regional Ombudsman Moe-Willis, Health Services Administrator Herrick, and Health Services Director Dillman. Id. ¶ 30. Napier alleges that these defendants did nothing to address his complaints of pain. In response to one of his grievances, Snoddy noted that Napier had seen a provider, that he had a scheduled sick-call visit, and that it would be up to a physician or NP to determine what treatment was "medically necessary." ECF No. 1-1 at 7. Similarly, Dillman informed Napier that the institutional physician was responsible for determining "the course of [his] pain management" and recommended that Napier "resubmit a sick call request for further evaluation of [his] medical needs and treatment plan." ECF No. 1-1 at 9. In response to another regular grievance, Meinhard determined that the issue was "[b]eyond the control of the Department of Corrections" because the medical department was "waiting on VCU scheduling," and Moe-Willis upheld the intake decision. ECF No. 1-1 at 13.

Medical records submitted by Napier indicate that on September 26, 2022, he reported having taken NSAIDs, Elavil, and nortriptyline without relief, after being prescribed 800 milligrams of Neurontin (gabapentin) three years earlier. ECF No. 1-5 at 39. The NP who examined him on that date placed him back on Neurontin. Id. Napier does not appear to complain about any subsequent changes to his medication regimen for neuropathy. See 2d Am. Compl. ¶ 75 (asserting that his nerve pain was not properly treated "prior to late 2022") (emphasis added); see also ECF No. 1-5 at 72 (December 2022 request from Napier indicating

that "[t]he medication prescribed for diabetic nerve pain is working" and asking that his prescription be renewed); Pl.'s Resp. Mots. Dismiss, ECF No. 108, at 29 (asserting that a provider told him in September 2022 that gabapentin could be prescribed again since Dr. Ohai had stopped working at the facility).

The VDOC defendants and the medical defendants argue that Claim 1 fails to state a claim of deliberate indifference against any of the named VDOC and medical defendants. The court will address each group of defendants in turn.

### a.    Clarke, Robinson, Amonette, Herrick, and Schilling

Napier seeks to hold Clarke, Robinson, Amonette, Herrick, and Schilling liable for implementing a VDOC policy that allegedly restricted the administration of gabapentin for pain. Although the VDOC defendants and the medical defendants acknowledge that diabetic neuropathy is an objectively serious medical condition, the VDOC defendants argue that Napier has failed to plausibly allege that the named administrators acted with deliberate indifference to Napier's serious medical needs. The court agrees.

An official can be held personally liable under § 1983 for policymaking decisions only if the official "acted with the state of mind required to establish the alleged constitutional violation," Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010), which, in this case, is deliberate indifference. See Gordon, 937 F.3d at 357–362 (concluding that genuine disputes of material fact existed as to whether Schilling and Amonette acted with deliberate indifference in creating or enforcing a policy that categorically excluded certain inmates from being treated for their hepatitis C virus). As indicated above, "[a]n official is deliberately indifferent to an inmate's

serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" Jackson, 775 F.3d at 178 (quoting Farmer, 511 U.S. at 837).

Here, unlike in Gordon, Napier does not allege that the policy implemented by Clarke, Robinson, Amonette, Herrick, and Schilling categorically excluded inmates from being treated for diabetic neuropathy or associated nerve pain. Instead, Napier alleges that the policy restricted prison healthcare providers from prescribing a particular medication—gabapentin. Although gabapentin is sometimes used to relieve the pain of diabetic neuropathy, it is not the only medication prescribed for that condition. Napier has not set forth facts from which the court could reasonably infer that the VDOC administrators were aware that placing restrictions on one form of treatment available for someone diagnosed with diabetic neuropathy, like Napier, "could create a substantial risk of harm to that person." Gordon, 937 F.3d at 357. Accordingly, to the extent Napier seeks to hold Clarke, Robinson, Amonette, Herrick and Schilling liable under § 1983 for creating or enforcing the challenged policy, the claim will be dismissed.

      **b.**    **Dr. Ohai**

Napier asserts that Dr. Ohai acted with deliberate indifference by refusing to prescribe or allow other members of his staff to prescribe gabapentin to treat Napier's diabetic nerve pain. Napier alleges that he informed Dr. Ohai that the alternative medications prescribed for him were ineffective and that he continued to suffer from excruciating pain, and that Dr. Ohai nonetheless refused to prescribe "the only medication which actually treated Napier's nerve pain," despite issuing a memorandum indicating that gabapentin could be prescribed on an

individual basis. Am. Compl. ¶¶ 22–23. Napier alleges that he experienced severe pain for three

years before finally being prescribed gabapentin again by a different provider.

Napier's allegations against Dr. Ohai are sufficient to state a claim for deliberate

indifference at this stage of the proceedings. While Napier was prescribed other medications

during the three-year period, "that alone does not foreclose" Napier's Eighth Amendment claim

against Dr. Ohai. Perry v. Meade, 728 F. App'x 180, 182 (4th Cir. 2018) (citing De'Lonta, 708

F.3d at 526 (holding that, even if defendants "provided [plaintiff] with some treatment       . . .

, it does not follow that [defendants] have necessarily provided constitutionally adequate

treatment")). "A prison physician cannot simply continue with a course of treatment that he

knows is ineffective in treating the inmate's condition." Arnett v. Webster, 658 F.3d 742, 754

(7th Cir. 2011) (cited with approval in Perry, supra). Napier's allegations that Dr. Ohai

"knowingly ignored his complaints of pain by continuing with a course of treatment that was

ineffective and less efficacious without exercising professional judgment are sufficient to state

a claim." Id. While Dr. Ohai may be able to establish "that he legitimately explored alternative

options and rejected them for valid reasons or that his treatment decisions were otherwise based

on his medical judgment," these questions will need to be explored on summary judgment and

cannot be decided under Rule 12(b)(6).[6] Id.; see also Goodman v. Johnson, 524 F. App'x 887,

889 (4th Cir. 2013) (vacating the dismissal of an inmate's claim that doctors refused to

adequately address his medical complaints and noting that "[a]lthough such claims may, on

---

[6] In the reply brief filed in support of their motion to dismiss, the medical defendants cite nine appellate court decisions to support their argument that "discontinuing an inmate's preferred medication of gabapentin is not necessarily deliberate indifference." Med. Defs.' Reply Br., ECF No. 112, at 6 (collecting cases). Notably, however, eight of the cases were decided on summary judgment, and the ninth case was filed against defendants who placed an inmate back on gabapentin after other medications proved unsuccessful).

closer inspection, amount to nothing more than a prisoner's disagreement with his diagnosis or prescribed treatment, prison doctors violate the Eighth Amendment if they . . . fail to adequately address a prisoner's complaints that the care he is receiving is not effective") (citing Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986)). Accordingly, the medical defendants' motion to dismiss will be denied with respect to the claim of deliberate indifference asserted against Dr. Ohai.

### c.    Bland, Starkey, and Worrell

Bland, Starkey, and Worrell are RNs to whom Napier spoke or complained during the period in which he was not prescribed gabapentin, and Bland also served in an administrative role as Heath Services Authority during the time period at issue. Napier alleges that none of the nurses "recommend[ed] a significant medical treatment plan" or "promulgate[d] that Napier be given an effective treatment for his well-documented, longstanding diabetic nerve pain." 2d Am. Compl. ¶ 19; see also id. ¶ 29.

The court agrees with the defendants that Napier's allegations against the nurses do not state a plausible violation of the Eighth Amendment. "As a matter of professional conduct, nurses may generally defer to instructions given by physicians," Holloway v. Del. Cnty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012), and the operative pleading acknowledges that the nurses had access to medical records reflecting that Napier had been prescribed various medications for nerve pain, including Cymbalta, a medication used to treat the pain associated with diabetic neuropathy. Although a nurse's deference "may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient," id., Napier does not allege facts from which the court could reasonably infer that the nurses knew that Dr. Ohai or any other

provider with prescribing authority "put his health at risk" by not administering gabapentin. Id. Additionally, under Virginia law, the RNs did not have the authority to prescribe gabapentin or any other controlled medication on their own. See Va. Code Ann.    § 54.1-3303 (listing the providers authorized to issue prescriptions for controlled substances); see also Holloway, 700 F.3d at 1076 (concluding that defendant nurses, who did not have authority to prescribe medication, did not act with deliberate indifference in following the orders of a doctor who declined to prescribe Oxycontin for the plaintiff). Accordingly, the court concludes that Claim 1 fails to state a claim against Bland, Starkey, and Worrell.

### d.    Snoddy, Woodson, Meinhard, Moe-Willis, Dillman, and Herrick

For similar reasons, the court concludes that Claim 1 fails to state an Eighth Amendment claim against the VDOC administrators and other non-medical correctional officials who allegedly received or reviewed complaints or grievances from Napier regarding the treatment provided for his diabetic neuropathy. "If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." Iko v. Shreve, 535 F.3d 225, 242 (4th Cir. 2008) (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)). Likewise, "supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." Williams v. Limestone Cnty., 198 F. App'x 893, 897 (11th Cir. 2006) (collecting cases). Neither the non-conclusory allegations made by Napier nor the grievance paperwork attached to his pleadings allow the court to reasonably infer that these defendants "subjectively recognized" that a substantial risk of serious harm existed and that their responses to his complaints "were inappropriate in light of that risk." Moss v. Harwood, 19 F.4th 614, 624 (4th Cir. 2021); see also id. (concluding that the mere

18

fact that an inmate put non-medical defendants on notice of his medical needs by repeatedly requesting medications was insufficient to establish that they subjectively appreciated that a weeks-long delay in receiving them posed a substantial risk of serious harm). Thus, the motion to dismiss filed on behalf of Snoddy, Woodson, Meinhard, Moe-Willis, Dillman, and Herrick will be granted with respect to Claim 1.

### 2.    Claim 2: Misdiagnosis of Bell's Palsy and Inadequate Treatment for ENT Issues

#### a.    Bell's Palsy

On September 1, 2020, Napier presented to the medical department with multiple issues, including facial sagging, eye twitching, slurred speech, blurry vision, chest and neck pain, dizziness, nausea, and painful lymph nodes. 2d Am. Compl. ¶ 43. Napier alleges that he saw Dr. Ohai that same day and that Dr. Ohai diagnosed him with Bell's palsy, without performing "diagnostic testing such as a CT scan, CAT scan, [or] MRI . . . to ensure a correct diagnosis." Id. ¶¶ 43–44. By email dated September 18, 2020, Napier reported that he had been prescribed "Acyclovir 400 mg" and prednisone for Bell's palsy and that he was "still on the [M]otrin for the pain every twelve hours," which was "help[ing]." ECF No. 1-2 at 7. Napier alleges that two physicians have since advised him that he likely suffered a "mini stroke" in August 2020. 2d Am. Compl. ¶ 43. He claims that Dr. Ohai's "misdiagnosis" was "deliberately indifferent and medically negligent." Id. ¶ 45.

It is well settled that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment" and that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also

Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (finding no deliberate indifference where doctors misdiagnosed a pituitary tumor that ultimately caused an inmate to go blind). Likewise, "the question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment," and "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Estelle, 429 U.S. at 107.

Applying these principles, the court concludes the alleged misdiagnosis by Dr. Ohai at most supports a claim of negligence, not deliberate indifference. See Jackson, 775 F.3d at 178–79 ("While a non-cardiologist's erroneous diagnosis of a serious heart condition, as alleged by Jackson, may well represent a deviation from the accepted standard of care, standing alone it is insufficient to clear the high bar of a constitutional claim."); see also Farmer, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for condemnation, cannot under our cases be condemned as the infliction of punishment [in violation of the Eighth Amendment]." Accordingly, the motion to dismiss filed by the medical defendants will be granted with respect to the claim of deliberate indifference asserted against Dr. Ohai in Claim 2(a).[7]

### b.    ENT Issues

In Claim 2(b), Napier asserts that he received inadequate medical treatment for various ENT issues, including chronic earaches and swollen lymph nodes in his neck. See 2d Am. ¶ 50 (describing earaches, swelling, and neck tenderness).

---

[7] Napier alleges that several defendants were working in the medical department on the day that he was diagnosed with Bell's palsy by Dr. Ohai, including Starkey, Bland, and Worrell. 2d Am. Compl. ¶ 43. To the extent Napier seeks to hold the nurses liable under § 1983 for the alleged misdiagnosis, such claim is also subject to dismissal for failure to state a constitutional claim.

On December 24, 2021, Napier submitted a written complaint alleging that he had been seen three times by two different NPs and that he "still [had] not been cured of [his] ear problems." Id. ¶ 53. Napier had recently undergone a neck ultrasound ordered by Dr. Ohai. ECF No. 1-4 at 48. Although the ultrasound revealed only a "benign . . . lymph node inferior to the left ear," the reviewing physician recommended a "[c]linical follow-up." Id. In response to Napier's complaint, defendant Starkey noted that the medical staff was "waiting on an appointment to be scheduled with VCU." 2d Am. Compl. ¶ 54. The following month, Napier saw an NP twice for his ENT issues, and the NP noted that an ENT referral was still pending. Id. ¶¶ 57–58.

On February 1, 2022, Napier submitted another written complaint alleging that he was still experiencing pain associated with "the enlargement and hardening of the lymph nodes" in his neck. Id. ¶ 58; ECF No. 1-1 at 31. Napier saw an NP again on February 3, 2021. ECF No. 1-1 a 35. In response to the written complaint, defendant Bland noted that he had "seen the provider on 2/3/22 concerning this issue." ECF No. 1-1 at 31.

After being prescribed Naprosyn[8] for pain, ECF No. 1-1 at 35, Napier filed a regular grievance alleging that he was not receiving adequate treatment for his ENT issues. Id. at 32. On February 28, 2022, defendant Woodson determined that the grievance was unfounded. ECF No. 1-1 at 35. Woodson noted that an NP had prescribed Naprosyn for pain and had ordered an appointment with an ENT specialist. Id. Defendant Dillman upheld the decision on March 31, 2022. ECF No. 1-1 at 37.

---

[8] Naprosyn (naproxen) is a NSAID medication prescribed to relieve pain, tenderness, swelling, and stiffness. Naproxen, U.S. National Library of Medicine: Medline Plus, available at https://medlineplus.gov/druginfo/meds/a681029.html (last accessed Sept. 24, 2025).

In the meantime, Napier submitted another written complaint asking to be "sent out this week" for an ENT appointment. ECF No. 1-1 at 38. In response, Bland indicated that Napier had a "pending ENT appointment." Id. Napier then filed a regular grievance asserting that the "promise of a 'pending' ENT appointment" would not relieve his pain. ECF No. 1-1 at 40. Defendant Meinhard rejected the grievance at intake as a request for services and advised Napier to submit a sick-call request to renew his prescription for Naprosyn. Id. at 41. The intake decision was upheld by defendant Hudson. Id.

On May 10, 2022, after learning that an existing ENT appointment had been cancelled, Napier submitted another written complaint emphasizing that he was still experiencing pain. 2d Am. Compl. ¶ 63. In response, defendant Starkey informed Napier that the ENT referral was pending and that the medical staff was "waiting for a date to be set." Id. ¶ 64.

The record reflects that Napier saw an ENT specialist with VCU Health System on July 11, 2022, and that the specialist recommended a nasal spray and "ibuprofen treatment" for pain. ECF No. 1-5 at 74; see also ECF No. 1-5 at 40 (handout from VCU Health System recommending ibuprofen (such as Motrin or Advil) for myofascial pain and temporomandibular joint disorder (TMJ)). Ibuprofen is in the same class of medications as Naprosyn.[9]

Having carefully reviewed Napier's allegations and the exhibits attached to his pleadings, the court concludes that he has failed to state a claim of deliberate indifference against any of

---

[9] See Ibuprofen, U.S. National Library of Medicine: Medline Plus, available at https://medlineplus.gov/druginfo/meds/a682159.html (last accessed Sept. 24, 2025) ("Prescription ibuprofen is used to relieve pain, tenderness, swelling, and stiffness . . . . Ibuprofen is in a class of medications called NSAIDs.").

the VDOC or medical defendants named with respect to Claim 2. To the extent Napier asserts

that the medical defendants failed to adequately treat his ENT issues, he has not set forth facts

from which the court could reasonably infer that the treatment provided was constitutionally

inadequate. The record reflects that Napier was examined on multiple occasions for his ENT-

related complaints, that medical staff at BKCC ordered an ultrasound and Naprosyn for pain,

and that they arranged for him to see an ENT specialist who ultimately recommended a similar

type of pain reliever. He has not plausibly shown that the medical providers or the non-medical

personnel responsible for responding to his complaints "actually kn[ew] of and disregard[ed] an

objectively serious condition, medical need, or risk of harm." De'Lonta, 330 F.3d at 634. To the

extent Napier disagrees with the treatment provided, mere disagreement "fall[s] short of

showing deliberate indifference." Jackson, 775 F.3d at 178.

To the extent Napier complains about the delay in obtaining an appointment with an

ENT specialist, his claim fares no better. "Mere delay" is not enough to support a claim of

deliberate indifference. Moskos v Hardee, 24 F.4th 289, 298 (4th Cir. 2022). To state an Eighth

Amendment claim based on a delay in receiving treatment, a prisoner must show that "the delay

itself place[d] the prisoner at 'substantial risk of serious harm,' such as where the prisoner's

condition deteriorates markedly or the ailment is of an urgent nature." Id. And he must show

that the defendants "subjectively recognized" that the delay posed a "substantial risk of serious

harm" and that "their actions were inappropriate in light of that risk." Moss, 19 F.4th at 624.

Napier has not put forth facts sufficient to support each of these elements. Accordingly, Claim

2(b) fails to state a claim of deliberate indifference, and the defendants' motions to dismiss will

be granted with respect to this claim.

23

3.     **Claim 3: Inadequate Treatment for a Hypertensive Emergency and a Non-Continuity of Medication for Hypertension and Diabetes**

a.     **Hypertensive Emergency on February 15, 2022**

In Claim 3(a), Napier alleges that his hypertension remained uncontrolled on February 15, 2022, despite having prescriptions for four "types of blood pressure medications." 2d Am. Compl. ¶ 76. While experiencing "severe symptoms" on that date, he asked RN Donnelly, a non-party nurse, to check his blood pressure at approximately 11:00 a.m.. Id. After finding his blood pressure to be "221/119," Donnelly informed Napier that she would tell medical defendant Bland that Napier needed to be "seen immediately." Id. Donnelly subsequently advised Bland that Napier needed to be called to the medical department for an EKG and additional blood- pressure checks. Id. ¶ 77. Nonetheless, Bland did not call for Napier herself or direct anyone else in the medical department to do so. Id. At approximately 5:00 p.m., Napier was instructed to go to the medical department. Id. ¶ 78. By that time, six hours had elapsed and Napier "still felt hypertensive." Id. When he arrived, medical defendant Starkey, another RN to whom Donnelly had spoken, refused to check Napier's blood pressure and told him to "get out" of the medical department. Id. A correctional officer subsequently requested assistance for Napier. Napier Aff., ECF No. 1-1 at 71. Napier was called to a different unit, and Nurse Lemmon, another non-party nurse, checked his blood pressure. Id. At that time, his blood pressure had lowered to "165/91," and Lemmon "said [Napier] was fine to go back to [his] pod." Id. Napier saw a provider four days later for his hypertension issues. ECF No. 1-1 at 60.

In the meantime, Napier filed grievances complaining about the lack of care provided by Bland and Starkey on February 15, 2022. 2d Am. Compl. ¶ 80; see also ECF No. 1-1 at 57 –

69. Napier asserted that he suffered "extreme distress" while waiting to be called to the medical department and that his "serious medical condition may have been deadly due to Bland's and Starkey's obvious constitutionally violative inactions." 2d Am. Compl. ¶ 80. Napier alleges that the grievances against Bland and Starkey were improperly determined to be unfounded by VDOC defendants Meinhard and Woodson, and that VDOC defendant Dillman nonetheless upheld their decisions on appeal. Id. ¶¶ 81–82.

At this stage of the proceedings, Napier's allegations are sufficient to state a claim of deliberate indifference against Bland and Starkey. The allegations indicate that Napier's blood pressure was high enough to indicate that he was experiencing a hypertensive crisis that required immediate medical attention and that Bland and Starkey knowingly and intentionally declined to assist him. While the medical defendants correctly note that there is no indication that Napier suffered a heart attack or other serious complications as a result of the delay in evaluating his blood pressure again on February 15, 2022, the Fourth Circuit "has been clear that an actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a substantial risk of serious harm." Phoenix, 95 F.4th at 860 (internal quotation marks and brackets omitted). Napier's allegations regarding RN Donnelly's response to his blood pressure reading, which must be accepted as true at this stage of the proceedings, plausibly suggest that Napier was experiencing a medical issue "of an urgent nature" and, thus, that the delay in providing any further assessment or treatment posed a substantial risk of harm. Moskos, 24 F.4th at 298. Accordingly, the medical defendants' motion to dismiss will be denied with respect to the claim of deliberate indifference asserted against Bland and Starkey in Claim 3(a).

25

To the extent Napier seeks to hold the VDOC defendants liable for failing to adequately respond to the grievances that he submitted regarding the February 15, 2022, incident, he fails to state a claim upon which relief may be granted. While he may disagree with their decisions, the mere fact that they denied or rejected his grievances does not provide a valid basis for liability under § 1983. See, e.g., King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023) (explaining that "a supervisor's 'mere knowledge' that his subordinates are engaged in unconstitutional conduct is not enough" to subject a supervisory official to liability under § 1983); George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007) (observing that "[o]nly persons who cause or participate in the violations are responsible" and that a prison official who merely "rejects an administrative complaint about a completed act of misconduct [is] not"). Accordingly, the VDOC defendants' motion will be granted with respect to Claim 3(a).

### b.    Non-Continuity of Medication for Hypertension and Diabetes

In Claim 3(b), Napier seeks to hold certain defendants liable for delays in providing him with his prescription diabetes medication and a prescription medication used to control his blood pressure (Losartan).[10] 2d Am. Compl. ¶ 86. Napier alleges that he "reordered" both medications "through the A.M. pill call nurse on May 8, 2022." Id. As of May 15, 2022, Napier had run out of both medications, and he began asking "every nurse he saw," including defendants Bland and Starkey, to check on his medications. Id. Napier alleges that despite informing him that they would check on the prescriptions for him, neither nurse verified that the prescriptions had been reordered Id. By May 19, 2022, "the diabetic [medication] had been

---

[10] Although Napier included Worrell and Stanford in the list of defendants named with respect to Claim 3(b), he indicates in response to the defendants' motions that he "joins counsel in dismissing" Worrell and Stanford as defendants to this claim. See Pl.'s Resp. Opp'n, ECF No. 108, at 47, 50. Accordingly, Claim 3(b) will be dismissed as to these defendants.

out for 6 days" and "the Losartan had been out for 8 days." Id. at n.60. Napier alleges that Bland and Starkey were aware that "stopping both of these medications could cause significant health problems, including uncontrolled blood pressure (hypertension) causing seizures and death." Id. ¶ 86. Nonetheless, the nurses "allowed Napier's medications to lapse" and "did not reorder them." Id.

On May 23, 2022, Napier filed a written complaint regarding the delay in receiving his prescribed medications. Id. ¶ 87; see also ECF No. 1-1 at 72. Eight days later, on May 31, 2022, Starkey responded that the medications had been ordered on May 26, 2022, more than 10 days after Napier had run out of them, and that the medical department was waiting for them to be delivered. ECF No. 1-1 at 72.

Napier subsequently submitted a regular grievance alleging that he was still waiting to receive his medication for hypertension and that he "could suffer a heart attack or stroke without [the] medication." ECF No. 1-1 at 74. The grievance was reviewed by defendants Meinhard and Bryant in June 2022. 2d Am. Compl. ¶¶ 87–88; see also ECF No. 1-1 at 76. In August 2002, Meinhart authored a Level I response for Assistant Warden Moore in which the grievance was determined to be unfounded. 2d Am. Compl. ¶ 90; see also ECF No. 1-1 at 77. The response included the following explanation for the decision:

> Around the time Nurse Practitioner Frost ordered your Losartan (on 5/27/2022), Medical staff was having issues getting shipments of medication. This would be a situation that is out of Virginia Department of Correction's control. On 6/29/2022, the medication was received and you began receiving your medication.

ECF No. 1-1 at 77. Napier appealed the decision to Level II, and it was upheld by defendant Dillman. ECF No. 1-1 at 79. By the time that Napier received his Losartan, he had gone without it for 48 days. 2d Am. Compl. ¶ 90.

Napier claims that Bland and Starkey acted with deliberate indifference by failing to ensure that his "life-sustaining" medications were reordered, after being told that he had run out of his medications for diabetes and hypertension. Id. ¶ 86. In moving to dismiss the claim against them, the medical defendants argue that Napier "does not allege that he actually suffered any negative health effects from the . . . lapse in his blood pressure and diabetes medication." Med. Defs.' Mem. Supp. Mot. Dismiss, ECF No. 97, at 18. As indicated above, however, a showing of "actual injury" is not required to prevail on a claim of deliberate indifference. Phoenix, 95 F.4th at 860. At this stage of the case, Napier's allegations plausibly show that Bland and Starkey had subjective knowledge of his serious medical conditions and of the excessive risk posed by their inaction. At a minimum, given the hypertensive emergency that allegedly occurred only a few months earlier, the court can reasonably infer that the delay in ordering Napier's hypertension medication "exposed him to a substantial risk of harm" and that the nurses consciously disregarded the risk. Id. at 861 (internal quotation marks omitted). Accordingly, the medical defendants' motion to dismiss will be denied with respect to the claim of deliberate indifference asserted against Bland and Starkey in Claim 3(b).

On the other hand, the court concludes that Napier has failed to state a claim against the VDOC defendants responsible for reviewing and responding to his regular grievance and related grievance appeal. By the time that Napier submitted the regular grievance on June 12, 2022, he had received his diabetes medication and his Losartan had been reordered. And by the

time he submitted the grievance appeal, he had been receiving his prescribed doses of Losartan for more than month. While the regular grievance plainly alerted Meinhart, Bryant, and Moore to the fact that he had been out of his Losartan for more than 10 days before it was reordered, Napier does not plausibly allege that these non-medical grievance officials could "directly provide" him with the medication or "control the speed with which [he received it]." Moss, 19 F.4th at 625. And "the mere fact of delay, by itself," does not suggest that the grievance officials deliberately chose to ignore a risk. Id. Accordingly, the VDOC defendants' motion will be granted as to the claim against the officials responsible for reviewing his grievances, including Meinhard, Bryant, Moore, Dillman, and Woodson.

### 4.      Claim 4: Failure to Follow a Dermatologist's Recommendations

Napier next asserts that various defendants violated the Eighth Amendment by failing to follow the recommendations of a dermatologist after Napier underwent a successful melanoma removal.

According to the second amended complaint, "Napier is bald" and "keeps his entire scalp shaved." 2d Am. Compl. ¶ 44 n. 29. In late 2019, Napier underwent surgery at Ridgeview Dermatology in Lynchburg, Virginia, to remove a malignant melanoma on his scalp. Id. ¶ 95. He returned for a follow-up appointment on June 30, 2020. ECF No. 1-4 at 12. After the appointment, the dermatologist recommended that Napier undergo a complete skin examination (CSE) every three months, an "annual eye exam," and a "dental exam." Id.

On March 3, 2021, defendant Meinhard received a complaint from Napier alleging that he had not been scheduled for the periodic dermatology, dental, and eye appointments recommended by the dermatologist. 2d Am. Compl. ¶ 107; ECF No. 1-1 at 15. On March 23,

2021, Napier submitted a regular grievance raising the same issues. 2d Am. Compl. ¶ 107; ECF No. 1-1 at 16. Less than a week later, on March 28, 2021, Napier underwent an eye exam, and the specialist recommended that he return every three months to "monitor for melanoma." ECF No. 1-4 at 15. Napier saw the dermatologist again on March 30, 2021, and the dermatologist recommend that he continue undergoing a skin examination every three months through the end of the year and that he continue having annual eye and dental appointments. ECF No. 1-4 at 16. Around the same time, Napier also saw the prison dentist. ECF No. 1-1 at 17.

Assistant Warden Snoddy responded to Napier's regular grievance on April 8, 2021. Id. Based on information obtained from the medical department, Snoddy determined that the grievance was unfounded. Snoddy noted that "scheduling appointments and keeping appointments [had] been a struggle at times" due to the COVID-19 pandemic and that Napier had since seen the dermatologist, an eye doctor, and the prison dentist. Id. Defendant Dillman upheld Snoddy's decision at Level II of the grievance process on May 14, 2021. ECF No. 1-1 at 19.

In January 2022, NP Lange "received Napier as a patient concerning . . . a dermatologist follow-up for a clinical skin exam." 2d Am. Compl. ¶ 102. Following a cursory examination, Lange reported that Napier had no "skin lesions or rashes." Id. ¶¶ 102–03. Dr. Ohai had previously noted that an outside dermatology appointment would not be necessary unless Napier had new skin problems. Id. Based on Dr. Ohai's recommendation and her appointment with Napier, Lange determined that a follow-up dermatology appointment was not necessary at that time. Id.

30

In April 2022, Dr. Ohai cancelled Napier's follow-up appointments at the dermatology practice Id. ¶ 104. He noted that skin examinations could be performed by a primary care provider at the prison. Id. ¶ 105.

In June 2022, Napier submitted a written complaint challenging the fact that he had not been seen by a dermatologist and alleging that Dr. Ohai had cancelled his appointments. Id. ¶ 106. In response, defendant Starkey noted that Dr. Ohai had determined that Napier's skin examinations could be performed onsite. Id. Starkey also noted that an eye examination had been scheduled, and she instructed Napier to "send an inmate request to dental" for any dental issues. ECF No. 1-1 at 44.

Napier subsequently filed a regular grievance raising the same issues. 2d Am. Compl. ¶ 112; ECF No. 1-1 at 81. On June 28, 2022, defendant Bryant rejected the grievance at intake and instructed Napier to submit a sick-call request. ECF No. 1-1 at 82. The intake decision was upheld by defendant Hudson on July 11, 2022. Id.

In the meantime, Napier submitted another regular grievance alleging that his dermatology appointments had been cancelled and that he had not been seen by Dr. Ohai or another primary care provider. ECF No. 1-1 at 45. On August 1, 2022, defendant Meinhart generated a continuance receipt summarizing the grievance, which was approved by Bryant. Id. at 47. Meinhart subsequently prepared a Level I response to the grievance, which was approved by Assistant Warden Moore. 2d Am. Compl. ¶ 117; ECF No. 1-1 at 48. In determining that the grievance was unfounded, Meinhart noted that Napier had "been seen by Dr. Ohai (PCP) in the Medical Department on 4/22/2022 and 7/11/2022," and that Napier had the opportunity to discuss any medical concerns during those appointments. Id. Napier alleges that the

information contained in the Level I response was incorrect and that the July 11 appointment

was with the "VCU ENT clinic—not Dr. Ohai." Id.; see also 2d Am. Compl. ¶ 117.

Napier appealed the Level I decision to the health services director. On September 7,

2022, defendant Dillman upheld the decision, explaining as follows:

> Please note that the institutional provider is responsible for your
> medical care and will ultimately determine the course of your
> medical treatment, or the need for essential medical care when
> there is modified movement due to the pandemic.
> Recommendations from the offsite specialist may be changed at
> the discretion of the facility provider as well. It is documented in
> your medical record that you were seen by the onsite medical
> provider on 8/12/22 and advised of the alternative treatment plan
> with regard to your dermatological condition . . . .
>
> If you have any further issues, please resubmit a sick call request
> for further evaluation of your medical needs and treatment plan.

ECF No. 1-1 at 51.

Medical records submitted by Napier indicate that he returned to Ridgeview

Dermatology on October 13, 2022. ECF No. 1-5 at 73. The dermatologist recommended that

Napier use a facewash and sunscreen and that he return for a follow-up appointment in six

months. Id.

Based on the foregoing, Napier asserts Eighth Amendment claims of deliberate

indifference against medical defendants Ohai and Starkey, and VDOC defendants Meinhard,

Snoddy, Dillman, Hudson, Bryant, and Moore.[11] See 2d Am. Compl. at 68. Turning first to the

claim against Dr. Ohai, Napier alleges that he acted with deliberate indifference by cancelling

---

[11]   Although Napier also includes defendant Herrick in the list of defendants named with respect to
Claim 4, he alleges no particular facts against him. Accordingly, he fails to show that Herrick was personally
involved in the alleged violation of his Eighth Amendment rights. Thus, any claim against Herrick must be
dismissed.

Napier's follow-up dermatology appointments and determining that the recommended skin examinations could be performed by prison providers. While Napier obviously disagrees with this decision, he has not set forth facts sufficient to show that Dr. Ohai's alternative treatment plan was "so grossly incompetent as to permit a finding of deliberate indifference." Hixson, 1 F.4th at 303 (internal quotation marks omitted). The record reflects that Dr. Ohai determined that an outside referral would not be necessary unless Napier had new skin issues, and Napier does not identify any new skin issues that Dr. Ohai or other providers failed to examine or treat. To the extent Napier believes that the primary care providers at the prison are not qualified to perform skin examinations or that the examinations performed thus far have not met the standard of care, "mere negligence is not enough to show deliberate indifference." Id.; see also Jackson, 775 F.3d at 178 (concluding that the fact that a prison doctor "substantially modified the medication regimen prescribed by [an inmate's] cardiologist" did not support an Eighth Amendment claim of deliberate indifference). Accordingly, Claim 4 fails to state a claim of deliberate indifference against Dr. Ohai.

The claim against Starkey, Meinhard, Snoddy, Dillman, Hudson, Bryant, and Moore is also subject to dismissal. The record reflects that outside medical appointments were promptly scheduled in March 2021, after Meinhard received a complaint from Napier, and there is no indication that Meinhard or any other grievance official was responsible for the delay. To the extent Napier seeks to hold Starkey, Meinhard, Snoddy, Dillman, Hudson, Bryant, and Moore responsible for their responses to his written complaints and grievances complaining about his dermatology appointments being cancelled, he does not plausibly allege that these defendants actually knew of and disregarded an excessive risk to his health or safety. The record reflects

33

that Dr. Ohai determined that the skin examinations recommended by the dermatologist could be performed by an onsite provider. While Napier obviously disagrees with that decision, he has not set forth facts from which the court could reasonably infer that RN Starkey or the administrators "subjectively appreciated" that Dr. Ohai's decision "posed a substantial risk of serious harm." Moss, 19 F.4th at 624. Consequently, Claim 4 will be dismissed as to these defendants.

### 5.    Claim 5: Failure to Keep or Schedule Outside Medical Appointments

In Claim 5, Napier alleges that VDOC defendant Worrell acted with deliberate indifference by cancelling and/or failing to promptly schedule outside medical appointments. To the extent the claim is based on the ENT appointment at VCU or the follow-up appointments recommended by the dermatologist, the claim is subject to dismissal for the reasons set forth above with respect to Claims 2 and 4. In short, Napier has not alleged facts sufficient to show that Worrell "subjectively knew of and disregarded an excessive risk to [his] health or safety." Hixson, 1 F.4th at 302.

Napier also alleges that Worrell cancelled scheduled appointments for a colonoscopy and failed to promptly reschedule the procedure. However, he does not plausibly allege that the delay "posed a substantial risk of serious harm" or that Worrell "subjectively appreciated any such risk." Moss, 19 F.4th at 624–25. Medical records submitted by Napier indicate that he ultimately underwent a "successful colonoscopy" at VCU Medical Center in April 2022 and that it was recommended that Napier undergo a "repeat surveillance colonoscopy in 5 years." ECF No. 1-4 at 32. Even assuming that Worrell was somehow negligent in failing to obtain an earlier appointment, "a showing of mere negligence" does not support a claim of deliberate

34

indifference. <u>Ford v. Hooks</u>, 108 F.4th 224, 230 (4th Cir. 2024) (internal quotation marks omitted). Accordingly, Claim 5 must be dismissed.

### 6.    Claim 6: Deliberate Indifference of Non-Medical Administrators

#### a.    Grievance Administrators

In Claim 6(a), Napier asserts a claim of deliberate indifference against "Grievance Administrators" Woodson, Snoddy, Edmonds, Moore, Meinhard, Bryant, Hudson, Harvey, Dillman, Elam, and Tucker. 2d Am. Compl. ¶ 123. However, he does not set forth any facts that are meaningfully different from the facts alleged with respect to Claims 1 through 4. For the reasons provided with respect to those claims, Napier fails to state a claim against the administrators responsible for responding to his various grievances. Accordingly, Claim 6(a) will be dismissed.

#### b.    VDOC Administrators

In Claim 6(b), Napier seeks to hold defendants Clarke, Robinson, Amonette, Herrick, Schilling, Tucker, Elam, and Durbin liable in their supervisory capacities on two grounds. First, Napier alleges that the VDOC administrators acted with deliberate indifference by contracting with Dr. Ohai to provide medical treatment to inmates at BKCC. <u>See</u> 2d Am. Compl. ¶¶ 127–129. Second, Napier alleges that these defendants "tacitly authorized and supported the deliberate indifference . . . of the medical defendants." <u>Id.</u> ¶ 130. The court agrees with the VDOC defendants that Napier's allegations are insufficient to state a claim against the administrators.

As an initial matter, Claim 6(b) includes only collective allegations against these "defendants." "The Supreme Court has made clear that to state a plausible [§ 1983] claim , 'a

plaintiff must plead that each Government-official, through the official's own individual actions, has violated the Constitution.'" Langford v. Joyner, 62 F.4th 122, 125 (4th Cir. 2023) (quoting Iqbal, 556 U.S. at 676). Consequently, the Fourth Circuit "require[s] sufficient facts to allow the court to infer liability as to each defendant." Id. at 126; see also King, 76 F.4th at 269 (emphasizing that "a complaint must contain specific allegations of each individual's conduct and state of mind"). Napier's collective allegations against all of the VDOC administrators named in Claim 6(b) do not satisfy this requirement.

Napier's allegations are also insufficient to satisfy the three-factor test for supervisory liability set forth in Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). "That test asks (1) whether 'the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive an unreasonable risk of constitutional injury'; (2) whether 'the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) 'whether 'there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" Younger v. Crowder, 79 F.4th 373, 384 n.16 (4th Cir. 2023) (quoting Shaw, 13 F.3d at 799). To satisfy the first element, a plaintiff must show that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Wilkins v. Montgomery, 751 F.3d 214, 226 (4th Cir. 2014) (internal quotation marks omitted). "As to the second element, a plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." Id. (internal quotation marks omitted). Finally, as to the third element, "[c]ausation is established when the

plaintiff demonstrates an affirmative causal link between the supervisor's inaction and the harm suffered by the plaintiff." Shaw, 13 F.3d at 799 (internal quotation marks omitted).

Napier has not alleged facts sufficient to support each of these elements. Citing to "prior court records," Napier argues that the defendants knew that Dr. Ohai "had been named in no less than six (6) federal lawsuits which claimed medical malpractice and deliberate indifference," some of which involved inmates who died while incarcerated at Fluvanna Correctional Center for Women. 2d Am. Compl. ¶ 129. However, the mere fact that prior lawsuits were brought by or on behalf of inmates for Eighth Amendment violations does not give rise to a plausible claim of supervisory liability. See, e.g., Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987) (emphasizing that "the number of complaints bears no relations to their validity"); Gantt v. Ferrara, No. 15-cv-7661, 2018 WL 4636991, at *7 (S.D.N.Y. Sept. 27, 2018) (finding plaintiff's allegation that the supervisory defendant had "knowledge of [his subordinate's] prior use of excessive force" because of "civil complaints and lawsuits" insufficient to sate a claim for supervisory liability); Doe v. Smereczynsky, No. 3:16-cv-00394, 2017 WL 1100426, at *5 (D. Conn. Mar. 23, 2017) (noting that "just as a mere allegation that there were other complaints or lawsuits concerning excessive force is not enough to sustain a Monell claim, it is not enough to sustain a supervisory liability claim"). Likewise, Napier's conclusory assertion that the defendants "tacitly authorized and supported the deliberate indifference" of medical personnel, 2d Am. Compl. ¶ 130, is insufficient to state a claim upon which relief may be granted. See King, 76 F.4th at 269 (concluding that the "boilerplate conclusion" that supervisory defendants "either maintained actual or constructive knowledge of the risk" did "not state a claim for relief") (internal quotation marks omitted). Consequently, Claim 6(b) must be dismissed.

**C.     Claims under State Law**

**1.     Claim 7: Negligence**

In Claim 7, Napier asserts claims of "medical negligence" against certain defendants, including medical defendants Dr. Ohai, Bland, Starkey, and VDOC defendant Worrell.[12] The VDOC defendants have moved to dismiss any claim of ordinary negligence against Worrell (or any other VDOC defendant) on the basis that the VDOC defendants, as state employees, are shielded by the doctrine of sovereign immunity.[13] For the reasons set forth by the VDOC defendants, the court agrees.

In Virginia, "the doctrine of sovereign immunity protects the state from liability for claims of negligence asserted against it." Coppage v. Mann, 906 F. Supp. 1025, 1047 (E.D. Va. 1995). "Because a state acts through its employees, the sovereign immunity doctrine extends to public employees as well." Id. "[W]hile some employees or agents of the Commonwealth may be entitled to the protection of sovereign immunity, all independent contractors are excluded from that protection." Atkinson v. Sachno, 261 Va. 278, 284, 541 S.E.2d 902, 905 (Va. 2001); see also Ogunde v. Prison Health Servs., Inc., 274 Va. 55, 62, 645 S.E.2d 520, 525 (Va. 2007)

---

[12] Although the list of defendants named with respect to Claim 7 includes defendant Stanford, Napier has voluntarily dismissed Stanford from this claim. See Pl.'s Resp. Opp'n, ECF No. 108, at 67.

[13] The medical defendants did not move to dismiss Claim 7 under Rule 12(b)(6). Contrary to Napier's response in opposition, however, this does not mean that they are in default or that he is entitled to default judgment. Federal Rule of Civil Procedure 55 provides for entry of default only when a party "has failed to plead or otherwise defend," and an entry of default is a prerequisite to a default judgment. See Fed. R. Civ. P. 55; Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 130 (4th Cir. 2020). "Although the term 'otherwise defend' as used in Rule 55(a) is not defined in the Rules, it is generally understood to include not only an answer, but also preliminary motions that indicate the party's intention to defend actively against the suit such as motions to dismiss or motions for summary judgment." Johnson v. Warner, No. 7:05-cv-00219, 2009 WL 586730, at *4 (W.D. Mar. 6, 2009) (footnote and citations omitted). It is clear from the record that the medical defendants are actively defending this action. Accordingly, they are not in default, and Napier is not entitled to any form of default judgment against them.

(concluding that a private correctional medical company and its employees were not entitled to sovereign immunity since they were independent contractors).

"[T]o determine whether derivative sovereign immunity applies to a state employee, a court must 'focus on four, non-exclusive factors.'" Pfaller v. Amonette, 55 F.4th 436, 456 (4th Cir. 2022) (quoting Patterson v. City of Danville, 301 Va. 181, 190, 875 S.E.2d 65, 70 (Va. 2022)). "These factors are (1) 'the function the employee was performing'; (2) 'the extent of the state's interest and involvement in that function'; (3) 'whether the act performed involves the use of judgment and discretion'; and (4) 'the degree of control and direction exercised by the state over the employee.'" Id. (quoting James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (Va. 1980)).

In cases involving the alleged failure to provide medical care to incarcerated inmates, the Fourth Circuit and the Supreme Court of Virginia have held that "the first two factors clearly weigh in favor of finding sovereign immunity." Id. (citing Patterson, 301 Va. at 194, 875 S.E.2d at 72). With respect to the third factor, cases from the Supreme Court of Virginia "uniformly emphasize the highly discretionary character of professional medical care." Patterson, 301 Va. at 195, 875 S.E.2d at 72. Indeed, the court has determined that acts similar to those at issue in this case "are discretionary in nature and require the exercise of judgment." Whitley v. Commonwealth, 260 Va. 482, 494, 538 S.E.2d 296, 302 (Va. 2000) (upholding the trial court's plea of sovereign immunity in a case in which a plaintiff alleged that nurses, among other actions, prepared incorrect renewal prescriptions for an inmate and failed to schedule the inmate to see a physician for periodic review of his seizure medications); see also Dallas v. Craft, No. 3:21-cv-00349, 2022 WL 2079312, at *28 (E.D. Va. June 9, 2022) (concluding that sovereign

39

immunity protected VDOC defendants from a plaintiff's claim of negligence arising from delayed access to medical care). Likewise, the actions taken by VDOC administrators, such as contracting with medical providers, implementing policies, and reviewing and responding to medical grievances, plainly involve the exercise of judgment and discretion. With respect to the fourth factor, courts have recognized that "Virginia has a great interest in and control over" the "administration of its prisons," Carter v. Richardson, No. 3:23-cv-00808, 2025 WL 1869580, at *22 n.9 (E.D. Va. July 7, 2025) (citing Myrick v. NaphCare, Inc., No. 3:16-cv-000952, 2017 WL 3234384, at *2 (E.D. Va. July 31, 2017)), and that state medical employees who work at correctional facilities do not have control over the patients they are obligated to treat and must comply with policies and procedures promulgated by the VDOC, Pfaller, 55 F.4th at 458. Considering these factors together, the court concludes that the doctrine of sovereign immunity protects the VDOC defendants from liability for any claim of ordinary negligence asserted against them.

In response to the VDOC defendants' motion, Napier argues that his claims of negligence should be construed as claims of gross negligence, since they are based on the same allegations made in support of his claims of deliberate indifference. Even assuming that the complaint is appropriately construed as asserting claims of gross negligence against the VDOC defendants, the court concludes that Napier has failed to state a claim upon which relief may be granted.

"[T]he standard for gross negligence in Virginia is very high." Doe v. Russell Cnty. Sch. Bd., 292 F. Supp. 3d 690, 716 (W.D. Va. 2018). "Gross negligence is 'a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete

neglect of the safety of such other person.'" Elliott v. Carter, 292 Va. 618, 622, 791 S.E.2d 730, 732 (Va. 2016) (quoting Cowan v. Hospice Support Care, Inc., 268 Va. 482, 487, 603 S.E.2d 916, 918 (Va. 2004)). It "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful negligence." Id. "It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." Williams v. Kincaid, 45 F.4th 759, 776 (4th Cir. 2022) (internal quotation marks omitted). "Because the standard for gross negligence in Virginia is one of indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." Elliott, 292 Va. at 622, 791 S.E.2d at 732.

The court has already concluded that the second amended complaint fails to state a claim of deliberate indifference against the VDOC defendants. For similar reasons, the court concludes that it fails to state a claim of gross negligence against them. In short, Napier has not plausibly alleged that any of the VDOC defendants engaged in conduct that would shock a reasonable person or that exhibited a complete neglect of his health or safety or the absence of even scant care. While Napier obviously believes that the medical care provided at BKCC has been inadequate, "merely inadequate care is insufficient to make out a claim of gross negligence." Williams, 45 F.4th at 776. Accordingly, to the extent Napier intended to assert claims of gross negligence against the VDOC defendants, the claims are subject to dismissal under 28 U.S.C. § 1915A(b)(1).

## 2. Claim 8: Intentional Infliction of Emotional Distress

41

In Claim 8, Napier asserts a claim of intentional infliction of emotional distress against the VDOC defendants and the medical defendants, based on their alleged failure to provide adequate medical treatment. He alleges that the defendants' actions or omissions resulted in "sleeplessness" and "depression." 2d Am. Compl. ¶ 144.

"The tort of intentional infliction of emotional distress is a disfavored cause of action." McKinney v. G4s Gov't Sols., Inc., 711 F. App'x 130, 138 (4th Cir. 2017) (citing Russo v. White, 241 Va. 23, 26, 400 S.E.2d 160, 162 (Va. 1991)). To state a claim for intentional infliction of emotional distress, a plaintiff must allege facts sufficient to show: (1) that "the wrongdoer's conduct was intentional or reckless"; (2) that "the conduct was outrageous or intolerable"; (3) that "there was a causal connection between the wrongdoer's conduct and the resulting emotional distress"; and (4) that "the resulting emotional distress was severe." Supervalu, Inc. v. Johnson, 276 Va. 356, 370, 666 S.E.2d 335, 343 (Va. 2008). With regard to the second element, "it is insufficient for a defendant to have acted with an intent which is tortious or even criminal." Russo, 241 Va. at 27, 400 S.E.2d at 162. Instead, a defendant's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. With respect to the fourth element, the Supreme Court of Virginia has emphasized that "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." 241 Va. at 27, 400 S.E.2d at 163.

Napier's allegations against the individual defendants are insufficient to satisfy either of these stringent standards. See Ogunde, 274 Va. at 66, 645 S.E.2d at 526–27 (concluding that an

inmate's claim of intentional infliction of emotional distress was properly dismissed since the alleged failure to provide appropriate medical treatment was not "so intolerable or outrageous such that it offend[ed] against the generally accepted standards of decency and morality"); Harris v. Kreutzer, 271 Va. 188, 204 –05, 624 S.E.2d 24, 34 (Va. 2006) (holding that the plaintiff's allegations of "severe psychological trauma and mental anguish affecting her mental and physical well-being," with symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling," were "insufficient to satisfy the fourth element" of the test for intentional infliction of emotional distress). Consequently, the claim of intentional infliction of emotional distress asserted in Claim 8 will be dismissed.

### 3.    Claim 9: Statutory Breach of Duty of Care

Napier's final claim is titled "Statutory Breach of Duty of Care." 2d Am. Compl. at 106. Although he indicates that the claim is asserted against individual defendants Clarke, Ohai, Bland, and Starkey, he does not cite to a particular statute or allege any facts in support of the claim. Because this claim plainly fails to give the named defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests," Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002), it must be dismissed.

### D.    Unserved Defendants

The Office of the Attorney General of Virginia previously declined to accept service of process on behalf of certain defendants, and service has not yet been accomplished on medical providers Lange, Frost, Yisrael, Allen, and Jamerson, or the VDOC administrator identified in the second amended complaint as Rose Durbin. Napier has filed a motion requesting that

service be accomplished on these six individuals, as well as the Commonwealth of Virginia and the VDOC.

For the reasons set forth above, the court concludes that any claim against the Commonwealth or the VDOC is subject to dismissal, as is any claim against Durbin. Durbin is named as a defendant with respect to Claim 6(b), in which Napier asserts claims of supervisory liability against the VDOC administrators. As explained above, that claim is subject to dismissal for failure to state a claim upon which relief may be granted, and any related claim of simple negligence against Durbin, as a VDOC employee, is barred by the doctrine of sovereign immunity. To the extent Napier intended to assert a claim of gross negligence against Durbin, such claim is also subject to dismissal for the reasons set forth above. Thus, to the extent Napier requests that the court arrange for service of process on Durbin, his motion will be denied.

On the other hand, the court finds it appropriate to undertake additional efforts to accomplish service of process on Lange, Frost, Yisrael, Allen, and Jamerson. Napier has asserted claims of deliberate indifference and medical negligence against these five medical providers, including claims related to his untreated diabetic neuropathy and the delays in receiving prescribed medications for diabetes and hypertension. Accordingly, Napier's motion will be granted with respect to these five defendants.

## IV.    Conclusion

For the reasons stated, the motion to dismiss filed by the VDOC defendants, ECF No. 94, is **GRANTED**; the motion to dismiss filed by the medical defendants, ECF No. 96, is **GRANTED IN PART AND DENIED IN PART**; Napier's motion for service of process, ECF No. 98, is **GRANTED IN PART AND DENIED IN PART**; and the claims against

44

the Commonwealth of Virginia, the VDOC, and Rose Durbin are summarily **DISMISSED**

without prejudice.

An appropriate order will be entered.

Entered: September 26, 2025

Mike Urbanski
Senior U.S. District
Judge
2025.09.26 13:46:50
-04'00'

Michael F. Urbanski
Senior United States District Judge